ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
JOHN J. NELSON (SBN 317598)
jnelson@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872.365.7060

ALEC H. SCHULTZ (*pro hac vice* forthcoming)
**HILGERS GRABEN PLLC**
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone: 305.630.8304
aschultz@hilgersgraben.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ETERNADA FUDGE and REYHANEH MANSOORI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

DELTA AIR LINES, INC.,

Defendant.

Case No. 2:24-cv-04531-HDV-SSC

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Date: September 19, 2024
Time: 10:00 a.m.
Judge: Hon. Hernán D. Vera
Courtroom: 5B

**TABLE OF CONTENTS**


I. INTRODUCTION. ..... 1

II. FACTUAL BACKGROUND. ..... 1

III. LEGAL STANDARDS. ..... 2

IV. ARGUMENT. ..... 3

A. This Court Has Specific Personal Jurisdiction Over Delta. ..... 3

1. Personal Jurisdiction Exists for Breach of Contract. ..... 3

2. Personal Jurisdiction Exists for a Violation of CIPA. ..... 6

B. Plaintiffs' Claims Are Not Preempted By The Airline Deregulation Act. ..... 8

C. Plaintiffs State A Claim For Breach Of Contract. ..... 12

D. Plaintiffs Sufficiently Plead A Violation Of CIPA. ..... 15

1. California Law Applies. ..... 15

2. Plaintiffs Did Not Consent to The Challenged Data Practices. ..... 18

3. Plaintiffs Plausibly Allege The Interception of Contents of a Communication. ..... 22

4. The Discovery Rule Tolls Plaintiff Mansoori's CIPA Claim. ..... 24

E. Plaintiffs Have Standing For Injunctive Relief. ..... 25

V. CONCLUSION. ..... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ades v. Omni Hotels Mgmt. Corp.*, 46 F.Supp.3d 999 (C.D. Cal. 2014) ..... 16

*Am. Airlines v. Wolens*, 513 U.S. 219 (1995) ..... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..... 2

*Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021) ..... 8

*Barbour v. John Muir Health*, 2023 WL 2618967 (Cal. Super. Jan. 05, 2023) ..... 23

*Baton v. Ledger SAS*, 2022 WL 17352192 (9th Cir. Dec. 1, 2022) ..... 5

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) ..... 17

*BellAtlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..... 2

*Belozerov v. Gannett Co.*, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) ..... 19

*Brack v. Omni Loan Co.*, 164 Cal. App. 4th 1312 (2008) ..... 16

*Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) ..... 18

*Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) ..... 21

*Bugarin v. All Nippon Airways Co.*, 513 F. Supp. 3d 1172 (N.D. Cal. 2021) ..... 4

*Calder v. Jones*,

465 U.S. 783 (1984) ... 6

*Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836 (N.D. Cal. 2014) ... 18, 20

*Charas v. TWA*, 160 F.3d 1259 (9th Cir. 1998) ... 9, 10

*Cody v. SoulCycle Inc.*, 2016 WL 4771392 (C.D. Cal. Jan. 11, 2016) ... 17

*Copeland v. Home Grown Music, Inc.*, 358 Ga. App. 743 (2021) ... 14

*D'Angelo v. FCA US, LLC*, 2024 WL 1625771 (S.D. Cal. Mar. 28, 2024) ... 26

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) ... 25

*Doe v. Eating Recovery Ctr. LLC*, 2024 WL 2852210 (N.D. Cal. June 4, 2024) ... 23

*Econ-O-Check Corp. v. Strategycorps*, No. 1:19-CV-3742-TWT, 2020 U.S. Dist. LEXIS 256375 (N.D. Ga. Mar. 23, 2020) 14

*Emmett v. Delta Air Lines, Inc.*, 2024 WL 2816502 (W.D. Pa. June 3, 2024) ... 7, 8, 11

*Erceg v. LendingClub Corp.*, 475 F.Supp.3d 1071 (N.D. Cal. 2020) ... 16

*Fields v. Legacy Health Sys.*, 413 F.3d 943 (9th Cir. 2005) ... 15

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) ... 3

*Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797 (2005) ... 25

*Franklin v. Ocwen Loan Servicing, LLC*, 2018 WL 5923450 (N.D. Cal. Nov. 13, 2018) ... 25

*Herbal Brands, Inc. v. Photoplaza, Inc.*,

72 F.4th 1085 (9th Cir. 2023) .......... 3

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .......... 23

*In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 18, 19, 20

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015) .......... 24

*In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) .......... 18, 21, 23, 24, 25

*In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) .......... 24

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006) .......... 8, 16, 17

*Khoja v. Orexigan Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .......... 22

*Kindt v. Concesionaria Vuela Compania de Aviacion S.A.P.I. de C.V.*, 2018 WL 4468320 (N.D. Cal. Sept. 18, 2018) .......... 6, 11

*King v. Brock*, 282 Ga. 56 (2007) .......... 14

*Love v. Associated Newspapers, Ltd.*, 611 F.3d 601 (9th Cir. 2010) .......... 6

*Massie v. Gen. Motors Co.*, 2021 WL 2142728 (E.D. Cal. May 26, 2021) .......... 5

*McCoy v. Alphabet, Inc.*, 2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 18, 21

*McGarry v. Delta Air Lines, Inc.*, 2019 WL 2558199 (C.D. Cal. June 18, 2019) .......... 11

*Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855 (S.D. Cal. 2023) .......... 5, 6

*Mitchell v. NY & Co Ecomm LLC*,

2024 WL 1328333 (C.D. Cal. Mar. 26, 2024) ........ 22

*Mosher-Clark v. Gravity Defyer Med. Tech. Corp.*,
2023 WL 5836976,n.2 (N.D. Cal. Sept. 8, 2023) ........ 22

*Nat'l Fed'n of the Blind v. United Airlines, Inc.*,
813 F.3d 718 (9th Cir. 2016) ........ 10

*Nedlloyd Lines B.V. v. Sup. Ct.*,
3 Cal. 4th 459 (1992) ........ 15

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ........ 23

*Norton v. Budget Rent a Car Sys.*,
307 Ga. App. 501 (2010) ........ 13

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ........ 18

*Palomino v. Facebook, Inc.*,
2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ........ 17

*People ex rel. Harris v. Delta Air Lines, Inc.*,
247 Cal. App. 4th 884 (2016) ........ 11

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........ 21

*Pica v. Delta Air Lines, Inc.*,
2019 WL 1598761 (C.D. Cal. Feb. 14, 2019) ........ 11

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ........ 23

*Rodriguez v. Aquatic Sales Sols. LLC*,
2024 WL 2804097 (C.D. Cal. May 29, 2024) ........ 4, 6, 7

*Rowe v. New Hampshire Motor Transport Ass'n*,
552 U.S. 364 (2008) ........ 10

*S.D. v. Hytto LTD*,
2019 WL 8333519 (N.D. Cal. May 15, 2019) ........ 7

*Saleh v. Nike, Inc.*,

562 F. Supp. 3d 503 (C.D. Cal. 2021) ........ 24

*SIS, LLC v. Stoneridge Software, Inc.*, 2023 WL 164067 (11th Cir. Jan. 12, 2023) ........ 14

*Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017) ........ 21

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ........ 3

*SunTrust Bank v. Bickerstaff*, 824 S.E.2d 717 (Ga. Ct. App. 2019) ........ 12

*Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732 (N.D. Cal. 2023) ........ 3, 4, 6

*Tanner v. Acushnet Co.*, 2023 WL 8152104 (C.D. Cal. Nov. 20, 2023) ........ 23

*Thurston v. Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231 (2020) ........ 3

*Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F.Supp.3d 1156 (S.D. Cal. 2015) ........ 15, 16

*User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 18, 20

*VATACS Grp., Inc. v. HomeSide Lending, Inc.*, 623 S.E.2d 534 (Ga. Ct. App. 2005) ........ 12

*Waryck v. Thor Motor Coach, Inc.*, 2023 WL 3794002 (S.D. Cal. Jan. 13, 2023) ........ 17

*Whitmire v. Colwell*, 285 S.E.2d 28 (Ga. Ct. App. 1981) ........ 12

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ........ 17

**Statutes**

18 Pa. C.S.A. §§ 5701 ........ 7

49 U.S.C. § 41713(b)(1) ........ 1

Cal. Penal Code § 630 ........ 16

California Penal Code § 631(a) ........ 1

Ga. Code Ann. § 16-11-66 ........ 17

Ga. Code § 16-11-62 ........ 17

**Other Authorities**

Restatement (Second) of Conflicts of Laws ........ 15, 16

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION.

Plaintiffs bring this class action against Defendant Delta Air Lines, Inc. ("Delta" or "Defendant") for its use of computer code that covertly shares website visitors' communications with www.delta.com. Delta installed a tracking pixel (the "Facebook Pixel" or "Pixel") on the website to surreptitiously duplicate and send its customers' personal information to Facebook, the contents of which contain a unique identifier (sufficient to identify the consumer by name) along with departure date, departure airport, arrival date, arrival airport, travel class, number of travelers, loyalty status, language, and currency used. The intercepted communications can then be used by Delta and Meta Platforms, Inc. ("Facebook") to build profiles for the purposes of retargeting and future marketing. Delta's conduct amounts to a breach of contract and violation of the California Invasion of Privacy Act ("CIPA"), California Penal Code § 631(a).

In response, Delta raises a series of arguments that are legally deficient and misread the Complaint. As explained below, Delta intentionally directed its tortious conduct towards California citizens, subjecting itself to the personal jurisdiction of this Court. Plaintiffs' claims are not so related to Delta's rates, routes, or services as to be preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1) ("ADA"). And Plaintiffs plausibly allege a breach of contract under Georgia law and wiretapping under California law. Delta's Motion to Dismiss should be denied.

## II. FACTUAL BACKGROUND.

Plaintiffs are California residents who purchased tickets from Delta's website for air travel out of California airports. Compl. ¶¶ 16-17, 22-23. Delta operates a website that allows customers to purchase tickets by entering information into "online forms," including departure date, departure airport, arrival date, arrival airport, travel class, number of travelers, loyalty status, and language. *Id.* ¶¶ 29-30.

In booking travel, Plaintiffs agreed to Delta's adhesion Contract of Carriage which represents that "All passenger information *shall* be handled in accordance with Delta's

Privacy Policy." *Id.* ¶¶ 31-32 (emphasis added). The Privacy Policy, in turn, states that "We do not sell your name or other personal information to third parties, and do not intend to do so in the future" followed by an enumerated list of situations in which certain data may be "shared," including that "We may share with third parties anonymous, aggregated information about all our users." *Id.* ¶ 33; Dkt. 12-2 at Section 7 (entitled "With Whom Does Delta Share Your Information"). The effect is a contractual agreement to share Plaintiffs and the class's personal information only to the extent disclosed in the Privacy Policy, *i.e.*, in an anonymized and disaggregated fashion unless expressly stated. *Id.*

Contrary to these promises, Delta purposely installed the Pixel on its website and programmed specific webpages to surreptitiously share its customers' personal information with Facebook in an identifiable manner. *Id.* ¶ 35. The Pixel tracks customers as they navigate the website and simultaneously transmits to Facebook the contents of their communications and selections, including information entered into fillable forms. *Id.* ¶¶ 36-59. Notably, if the customer is also a Facebook user (like Plaintiffs), the information Facebook receives is linked to the customer's Facebook profile via their Facebook ID, which identifies the customer by name. *Id.* ¶¶ 19, 25, 38-39, 61.

## III. LEGAL STANDARDS.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, "accepted as true," to "state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility, however, is not certainty or probability. It "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *BellAtlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

In other words, a complaint may advance even if it appears that "actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* Thus, plaintiffs do not need to substantiate their claims at the pleadings stage, and the complaint

"may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." *Starr v. Baca*, 652 F.3d 1202, 1216-1217 (9th Cir. 2011) (emphasis in original).

## IV. ARGUMENT.

### A. <u>This Court Has Specific Personal Jurisdiction Over Delta.</u>

#### 1. Personal Jurisdiction Exists for Breach of Contract.

Delta does not argue that it failed to "purposefully avail" itself of the benefits of California. *See Thurston v. Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231, 1240 (2020) ("making a substantial number of sales of goods or services to California residents via one's own website constitutes purposeful availment."); *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1092-93 (9th Cir. 2023) (accord). Rather, Delta argues that Plaintiffs' breach of contract claim does not relate to Delta's contacts with California and, thus, the Court is without jurisdiction over the contract claim. Mot. at 5-7. This mischaracterizes the allegations of the Complaint.

The "minimum contacts inquiry considers whether the plaintiff's claims 'arise out of or relate to the defendant's contacts with the forum.'" *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 742-43 (N.D. Cal. 2023) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing," *id.*, including when a defendant "systematically serve[s] a market" in the forum state." *Ford*, 592 U.S. at 365-66.

For example, at issue in *Swarts* was Home Depot's online chat feature in which Home Depot recorded conversations with customers. *Swarts*, 689 F. Supp 3d at 737-38. Home Depot argued the "generic allegations" about its "sales and business contacts in California" failed the relatedness test and were "too attenuated from . . . alleged recording" of chats. *Id.*, at 742-43. The court disagreed. "At the very least, Swarts's claim that Home Depot recorded online chat conversations concerning products he had

purchased without his consent relates to Home Depot's connection with the forum." *Id.*

Similarly, in *Rodriguez v. Aquatic Sales Sols. LLC*, No. 2:23-CV-05198-CAS-EX, 2024 WL 2804097 (C.D. Cal. May 29, 2024), another CIPA website wiretapping case, the court addressed personal jurisdiction at length and held the plaintiff's claim related to defendant's forum contacts where (1) the "Website, and its accompanying chat feature, were accessible in California," (2) the chat feature "allowed consumers to communicate directly with Defendant through the Website" while also "allowing a third-party to wiretap and eavesdrop upon the private conversations," and (3) the defendant sold goods to consumers in California through the website. *Id.*, at *4-5. In the court's words:

> [P]laintiff's privacy claims are related to defendant's sales to California. Defendant presumably offered the chat feature on its Website to facilitate consumer transactions by, for example, allowing potential consumers to ask questions about products or allowing consumers to seek assistance regarding products they purchased in the past. In other words, defendant operated the chat feature to drive sales to consumers, including consumers in California. For the purposes of personal jurisdiction, sales resulting from defendant's efforts to drive sales to California consumers are sufficiently related to claims arising from those efforts.

*Id.*, at *5.

Finally, in *Bugarin v. All Nippon Airways Co.*, 513 F. Supp. 3d 1172 (N.D. Cal. 2021), the plaintiff alleged All Nippon Airways breached its conditions of carriage by failing to issue refunds to passengers whose flights were canceled as a result of the COVID-19 pandemic. The court rejected All Nippon Airways's challenge to personal jurisdiction because the contract was between the airline and a California resident, and the plaintiff's claims arose out of defendant's cancelation of a flight scheduled to fly into California. *Id.* at 1186-87.

Here, like *Swarts*, *Rodriguez*, and *All Nippon Airways Co.*, Plaintiffs' breach of contract claim relates to Delta's contacts with California. Specifically, Plaintiffs used Delta's website accessible in California to contract with Delta while present in California for flights departing from California. Compl. ¶¶ 15, 17, 23. Plaintiffs entered their personal information on Delta's website while in California, and the information

concerned their California-based flights. *Id.* The contracts restrict Delta's ability to share this information with third parties. *Id.* ¶¶ 3, 30-34. The information was shared by Delta with Facebook, a California-based company. And, critically, Delta breached the contracts when Plaintiffs' personal information was intercepted *from their computers in California*. *Id.* ¶¶ 9 (Delta's "website, and more specifically its source code, manipulated Plaintiffs' and Class Members' web browsers so that their communications to Defendant were automatically, contemporaneously, jointly, and surreptitiously sent to Facebook"), 10 ("This is the functional equivalent of placing a bug or listening device on a phone line"), 12 (the Pixel "co-opts a website user's browser and forces it to transmit information to Facebook"), 47-59 (describing duplication and simultaneous transmission). In other words, the source code embedded on Delta's website caused the duplication and interception of communications in California, concerned California travel, and were delivered to an entity in California.

As an independent basis for "relatedness," Plaintiffs' claims arise out of Delta's contacts with California because they are a "but for" cause of the dispute. *See Baton v. Ledger SAS*, No. 21-17036, 2022 WL 17352192, at *1-3 (9th Cir. Dec. 1, 2022) (finding personal jurisdiction where "Buyers are required to disclose personal information in order to buy the wallets, Ledger retains those data for e-commerce and marketing purposes . . . and Plaintiffs allege that they would not have bought wallets had they known of Ledger's poor data security practices"). Plaintiffs would have no breach of contract claim absent Delta's contracting with California customers and aiding the interception of information emanating from California. *Id.* ¶¶ 3, 9, 10, 12, 15, 17, 23, 30-34, 47-59.

Delta's cited authorities are distinguishable. Mot. at 5-6. For example, *Massie v. Gen. Motors Co.*, No. 1:20-CV-01560-JLT, 2021 WL 2142728 (E.D. Cal. May 26, 2021) and *Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855 (S.D. Cal. 2023) found personal jurisdiction lacking based on the California plaintiffs' alleged use of defendants' websites. But the plaintiffs did not purchase any product or service through these websites. *Massie*, 2021 WL 2142728 at *6 ("Plaintiffs' claims have nothing to do with

GM's sales of vehicles in California or any other conduct by GM aimed at California" because "neither Plaintiff even made a purchase on GM's websites"); *Mikulsky*, 682 F. Supp. 3d at 868 (same). Here, however, Plaintiffs visited Delta's website to purchase tickets for travel out of a Delta hub in California, and the content of their communications relating to this travel was intercepted. Indeed, *Swarts* distinguished *Mikulsky* in part for this reason. *Swarts*, 689 F. Supp. 3d at 742 n.3 ("Neither case involved a situation in which a plaintiff purchased products from, or for delivery into, the forum state"); *id.* at 743 (intercepted communications concerned HomeDepot.com purchase).

Accordingly, the Court has personal jurisdiction for the breach of contract claim.

**2. Personal Jurisdiction Exists for a Violation of CIPA.**

***Purposeful Direction.*** A CIPA violation is an intentional tort subject to the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984). "The [*Calder*] effects test is satisfied if (1) the defendant committed an intentional act; (2) the act was expressly aimed at the forum state; and (3) the act caused harm that the defendant knew was likely to be suffered in the forum state." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 609 (9th Cir. 2010). Delta disputes the latter two elements.

Under the effects test, an "interactive website plus 'something more' constitutes 'express aiming.'" *Rodriguez*, 2024 WL 2804097, at *9 (quoting *Herbal Brands, Inc.*). Sales of goods or services to California residents suffice as the requisite "something more." *Id.* Regarding knowledge of harm likely to be suffered in the forum, "[t]his element does not require that the 'brunt' of the harm be suffered in the forum, and may be established even if 'the bulk of the harm' occurs outside the forum." *Id.* (cleaned up).

Here, Delta intentionally targeted its services at California citizens by servicing the state's airports and offering flights for sale through the website. Compl. ¶¶ 3, 14-15, 16-17, 22-23; Declaration of Alexander E. Wolf ("Wolf Decl.") ¶¶ 2-5 (articles and statistics describing Delta's "deep ties to the Los Angeles community"). This is "express aiming." *Rodriguez*, 2024 WL 2804097, at *9; *Swarts*, 689 F. Supp. 3d at 741-42; *Kindt v. Concesionaria Vuela Compania de Aviacion S.A.P.I. de C.V.*, No. 17-CV-04333-JD,

2018 WL 4468320, at *1 (N.D. Cal. Sept. 18, 2018) (in a CIPA case, explaining "Volaris operates regular passenger airline services and flights in and out of the Oakland and San Jose international airports, both of which are located in this district. Volaris provides toll-free numbers for customers within the district to call about its airline services. These undisputed facts amply establish specific personal jurisdiction in this Court.").

Further, that Delta offers flights to and from California airports establishes that Delta knew California citizens would browse its website and book flights to and from California. Indeed, Delta allows individuals to search for flights to and from California, and, in addition to including departure and arrival dates, the intercepted communications include departure airports and arrival airports in California. Compl. ¶¶ 2, 17-20, 23-26. It is thus certain that Delta knew it was aiding the interception of electronic communications of California citizens, which would harm California citizens. *See Rodriguez,* 2024 WL 2804097, at *10 (defendant "was aware that it was recording its online chat conversations with customers, which could foreseeably cause harm in California."); *S.D. v. Hytto LTD*, 2019 WL 8333519, at *4-5 (N.D. Cal. May 15, 2019) ("by intercepting the transmissions of Body Chat app users, Hytto targeted its wrongful conduct at customers, some of whom Hytto knew, at least constructively, were residents of the U.S.").

Of note, Delta's jurisdictional arguments were recently rejected in an analogous case involving Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701, et seq. ("WESCA"). *See Emmett v. Delta Air Lines, Inc.*, No. 2:22-1568, 2024 WL 2816502 (W.D. Pa. June 3, 2024). *Emmett* concerned "session replay" source code embedded on Delta's website that monitored "mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and numerous other forms of a user's navigation and interaction through the website." *Id.*, at *1-2. There, as here, Delta argued that (1) "courts repeatedly find a lack of express aiming in cases involving nationally accessible websites," and (2) plaintiff failed to allege that Delta knew that plaintiff was likely to be harmed in Pennsylvania. *Id.*, at *4-5.

The court rejected both arguments. First, "the standard described by Defendant

would essentially foreclose most people injured by e-commerce websites from seeking redress in the forum in which they were harmed." *Id.*, at *5. Second, there is a "distinction between a company that incidentally makes its website available in a particular state (because it is available nationwide)" and a company that "knowingly interact[s] with residents of the forum state via its web site, or through sufficient other related contacts." *Id.* Delta's website is "more analogous to the latter." *Id.* Indeed, Delta "services customers in Pennsylvania primarily through airports, but has an additional interest in having residents in Pennsylvania visit the website to facilitate ease of commerce." *Id.* In other words, "Delta.com is not merely an informational website available nationwide so that Americans can engage with the brand or receive a service accessed directly through an online application or portal." *Id.*, at *7. "Instead, Defendant's website provides a platform by which Defendant sells the service of transporting travelers to and from various airports." *Id.*

So too here. *Emmett* is on point and Delta's arguments should be rejected.

***Relatedness***. As explained above, Delta uses its website to solicit business from California citizens and to direct them to flights in and out of California. The website is a critical part of Delta's efforts to maximize sales revenue in California, and the duplication and interception of Plaintiffs' communications emanating from California is the specific basis of this lawsuit. *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 119 (2006) (noting CIPA Section 631 "specifically applies to any person who attempts to learn the content of any communication "while the same *is in transit ... or is being sent from, or received at any place within this state.*") (emphasis in original). Thus, Delta's "attempt[] to serve and attract customers in the [California] market" by means of its interactive retail website directly caused the privacy-related injuries that form the basis of Plaintiffs' claims. *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021).

**B. <u>Plaintiffs' Claims Are Not Preempted By The Airline Deregulation Act.</u>**

Delta's ADA preemption argument overlooks controlling precedent and was

rejected just two months ago in an analogous wiretapping case.

The Ninth Circuit categorically rejected the position Delta advances here, namely, treating the ADA's preemption provision as a wholesale grant of immunity from any state law cause of action. The Ninth Circuit explained that the Supreme Court "cautioned us that preemption provisions are narrowly and strictly construed, and has directed us to look to the provisions of the whole law, and to its object and policy." *Charas v. TWA*, 160 F.3d 1259, 1264 (9th Cir. 1998) (en banc). Describing the ADA's preemption provision, the Ninth Circuit added "[n]othing in the Act itself, or its legislative history, indicates that Congress had a clear and manifest purpose to displace state tort law in actions that do not affect deregulation in more than a peripheral manner." *Id*. at 1265 (internal quotations omitted).

Critically, the Ninth Circuit held the following with respect to the scope of ADA preemption and the definition of "service" under the Act:

> Airlines' 'rates' and 'routes' generally refer to the point-to-point transport of passengers. 'Rates' indicates price; 'routes' refers to courses of travel. It therefore follows that 'service,' when juxtaposed to 'rates' and 'routes,' refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided (as in, 'This airline provides service from Tucson to New York twice a day.') *To interpret 'service' more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does. It seems clear to us that that is not what Congress intended.*

*Id*. at 1265-1266 (emphasis added).

Delta fails to discuss this case, but it is controlling. Plaintiffs' claims do not, in any fashion, result in impermissible economic regulation of Delta. *See id*. at 1266 ("We conclude that when Congress enacted *federal* economic deregulation of the airlines, it intended to insulate the industry from possible *state* economic regulation as well. It intended to encourage the forces of competition.") (emphasis in original).

***CIPA Claim.*** Subjecting Delta to a CIPA claim will have no effect on Delta's services or prices, nor would it frustrate the ADA's statutory goal. Per *Charas*, "services"

refers to "frequency and scheduling of transportation" and "the selection of markets to or from which transportation is provided" (*id*. at 1265-1266); there is no basis to expand the scope of "services" to include the capture of a passenger's personal information for Delta and Facebook to then use in future sales efforts unrelated to the passenger's booked ticket. This point is critical, as Delta's conduct at issue in this case is unrelated to the passenger's actual air travel (and any covered service Delta provides as part of that air travel).

The flaw in Delta's preemption argument is confirmed by cases applying *Charas*. In *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718 (9th Cir. 2016), the Ninth Circuit held that airline airport ticketing kiosks are not "services" under the ADA. "[K]iosks are not prices, schedules, origins [or] destinations of the point-to-point transportation of passengers, cargo, or mail." *Id*. at 726. Notably, these airport kiosks are far more connected to an actual airline "service" than the conduct of Delta at issue in this case—the kiosks allowed customers to print boarding passes, check luggage, and select or upgrade seats shortly before a flight. *See id*. at 723. Because these are airport activities that immediately precede boarding a flight, they are more closely connected to an airline "service" than capturing passenger personal information for marketing on Facebook. And still the Ninth Circuit rejected ADA preemption as to claims concerning the kiosks: "Nor is it significant that kiosks *facilitate services* that *relate to air transportation*. As we noted in *Charas*, Congress did not intend 'service' to refer to the 'assistance to passengers in need, or like functions.' While they may be convenient for passengers, kiosks are not 'services' in the 'public utility sense.'" *Id*. at 726 (emphasis added and internal citation omitted).[1] If claims related to airport ticketing kiosks are not subject to ADA preemption, then Delta's conduct here is not subject to preemption.

---

[1] The Ninth Circuit also rejected the contention that *Charas* had been overruled by the Supreme Court's opinion in *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008), cited by Delta. *Id*. at 727 ("*Rowe's* understanding of the term 'service' is entirely consistent with our decision in *Charas*.").

To be sure, as noted above, Delta recently advanced this same argument and lost it in *Emmett*. There, as here, Delta argued its conduct—the capture of consumer communications with its website using "session replay" software—fell within the scope of the ADA and preempted plaintiff's WESCA claim.

The *Emmett* court noted that the law in the Third Circuit mirrored that of the Ninth Circuit, and it cited to *Charas* in rejecting Delta's preemption argument. "[T]he ADA does not allow airlines to simply conduct business however they see fit without being subjected to state laws." 2024 WL 2816502, at *32. Indeed, "Plaintiff brings tort actions against an airline, and, if successful, the Court is not convinced that such action would limit the airline's public utility function or act as a 're-regulation' of the industry in opposition to the legislative intent of the ADA." *Id*. at *33. "It seems that even if the result of this action would be that Defendant is prevented from engaging in the allegedly harmful behavior going forward, all the central functions of the airline would still survive." *Id*. The same result, under the same precedent, should occur here.

None of the cases Delta cites alters that conclusion. Mot. at 10-13. *McGarry v. Delta Air Lines, Inc.*, 2019 WL 2558199 (C.D. Cal. June 18, 2019) was not a CIPA case and did not cite the binding precedent of *Charas*. Instead, it found ADA preemption for a third-party beneficiary claim and unjust enrichment claim on the basis that the alleged duties were external to any applicable contract. In *Pica v. Delta Air Lines, Inc*., No. CV 18-2876-MWF (Ex), 2019 WL 1598761 (C.D. Cal. Feb. 14, 2019), which also did not involve a CIPA claim, the same court again failed to cite the controlling *Charas* precedent and failed to cite or analyze *Nat'l Fed'n of the Blind*. Delta's citations are irreconcilable with binding Ninth Circuit precedent.

The same is true for *People ex rel. Harris v. Delta Air Lines, Inc*., 247 Cal. App. 4th 884 (2016), wherein the court expressly noted *Charas* and its definition of service but stated "[w]e are … not bound by the decisions of federal courts other than the United States Supreme Court." *Id*. at 901, n.13. *Accord Kindt*, 2018 WL 4468320, at *2 (CIPA claim against airline not preempted and explaining that *People ex rel. Harris* is

inconsistent with Ninth Circuit precedent). This Court, of course, is bound by the Ninth Circuit and required to follow *Charas*.

***Contract Claim.*** Finally, Delta argues in passing that Plaintiffs' breach of contract claim is also preempted. Mot. at 13. As Delta recognizes, however, the Supreme Court expressly held that ADA preemption does not apply to breach of contract claims alleging a violation of an airline's self-imposed undertakings. *Am. Airlines v. Wolens*, 513 U.S. 219, 228-29 (1995) ("terms and conditions airlines offer and passengers accept are privately ordered obligations and thus do not amount to a State's enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law within the meaning of [§]1305(a)(1).") (internal quotations omitted).

Plaintiffs have alleged breach of a self-imposed undertaking. Delta violated its agreement to only share customer personal information in an anonymized, disaggregated manner. Compl. ¶¶116-124. This claim falls squarely within the *Wolens* framework.

### C. Plaintiffs State A Claim For Breach Of Contract.

Delta's grounds for dismissing the breach of contract claim fail because Plaintiffs meet the requisite pleading requirements and Plaintiffs' interpretation of the contract is plausible. Delta asks the Court to ignore well-pled allegations of breach and instead substitute a self-serving narrative of Delta's creation. That, however, is impermissible under the relevant standards.

Delta's Contract of Carriage, with its incorporated Privacy Policy, is an adhesion contract. Under Georgia law, adhesion contracts "are strictly construed against the drafter." *SunTrust Bank v. Bickerstaff*, 824 S.E.2d 717, 726 (Ga. Ct. App. 2019) (citation omitted). "[A] contract must be interpreted to give the greatest effect possible to all provisions rather than to leave any part of the contract unreasonable or having no effect." *VATACS Grp., Inc. v. HomeSide Lending, Inc.*, 623 S.E.2d 534, 538 (Ga. Ct. App. 2005) (citation omitted); *see also Whitmire v. Colwell*, 285 S.E.2d 28, 29 (Ga. Ct. App. 1981) ("[T]he law requires that in interpreting a contract, [the court] 'give a reasonable, lawful and effective meaning to all manifestations of intention by the parties rather than an

interpretation which leaves a part of such manifestations unreasonable or of no effect.'") (citation omitted). Accordingly, Delta's contract of adhesion must be strictly construed against Delta and all provisions must be read together so as to give each their greatest effect and in a manner that complies with applicable law. Applying this analysis, Plaintiffs state a viable contract claim.

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent a Car Sys*., 307 Ga. App. 501, 502 (2010). Plaintiffs have pled these elements. They identified the Contract of Carriage and incorporated Privacy Policy as the operative agreement, and they identified how Delta breached that agreement, specifically by sharing Plaintiffs' personal information in a non-anonymized, disaggregated fashion in violation of the Privacy Policy's stated terms. *E.g.*, Compl. ¶¶111-124.

As Plaintiffs allege, the relevant provision of the adhesion contract only allows Delta to share their personal information in an anonymous, aggregated format. *Id.* The Contract of Carriage states "All passenger information shall be handled in accordance with Delta's Privacy Policy." *Id.* ¶ 114-115. Delta's Privacy Policy (Section 7), in turn, states "We do not sell your name or other personal information to third parties, and do not intend to do so in the future" followed by an enumerated list of situations in which certain data "may" be shared. *Id.* ¶ 16. This includes: "We may share with third parties anonymous, aggregated information about all our users." *Id.* There is no mention of sharing customer information with Facebook in an identifiable and disaggregated manner for marketing purposes. Plaintiffs have also pled that this breach caused them damages, as their personal information, in an identifiable and disaggregated format, has monetary value. *Id.* ¶¶ 83-92 (discussing value of customer information). That is all Georgia law

requires for Plaintiffs to state a viable claim.[2]

In seeking dismissal, Delta commits an error of contract interpretation. According to Delta, even though the contract only allows for the sharing of aggregated, anonymous data, that language is somehow meaningless and subsumed within what it claims is Plaintiffs' "global consent" to the use of the Facebook Pixel. Delta has the analysis backwards. Having expressly stated that it may share customer personal data *only* in an "anonymous, aggregated" manner, Compl. ¶¶ 113-118, Delta may not breach that obligation by claiming Plaintiffs consented more generally to Delta's use of tracking technologies.

Moreover, Delta ignores the related contract interpretation principle of *expression unius est exclusio alterius*—the specific mention of a type of data that may be shared excludes others. Georgia law recognizes this method of contract interpretation. *"[E]xpressio unius est exclusio alterius* or the express mention of one thing implies the exclusion of another[,] which, in turn, requires us to conclude that such omission was intentional." *Copeland v. Home Grown Music, Inc*., 358 Ga. App. 743, 748-49 (2021) (internal quotations omitted). Because Delta provided a specific type of customer personal data it was permitted to share with third parties, it cannot claim that the contract simultaneously allows it to share a data type expressly excluded from the contract's terms. Compl. ¶¶ 113-118. Based upon these contract interpretation principles, Plaintiffs state a viable contract claim.[3]

---

[2] Plaintiffs state a breach of contract claim even in the absence of money damages because nominal damages are available under Georgia law. *King v. Brock*, 282 Ga. 56, 57 (2007) ("Nominal damages come into play when an injured party establishes a breach of contract, but is unable to prove actual damages."); *SIS, LLC v. Stoneridge Software, Inc*., No. 21-13567, 2023 WL 164067, at *8 (11th Cir. Jan. 12, 2023) (same).

[3] Should the Court believe additional contract interpretation is necessary as to this claim, it should conduct that analysis at a later stage of the proceedings. *Econ-O-Check Corp. v.*

### D. Plaintiffs Sufficiently Plead A Violation Of CIPA.

#### 1. California Law Applies.

The Georgia choice of law provision in Delta's Contract of Carriage does not nullify the protections afforded by the California Penal Code, and specifically CIPA.

"Federal courts sitting in diversity jurisdiction look to the law of the forum state in choice-of-law determinations." *Fields v. Legacy Health Sys*., 413 F.3d 943, 950 (9th Cir. 2005). As Delta recognizes, California follows the approach set forth in the Restatement (Second) of Conflicts of Laws, Section 187, which sets forth the following standard:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or
>
> (b) application of the law of the chosen state would be *contrary to a fundamental policy* of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187 (emphasis added); Mot. at 16-17; *Nedlloyd Lines B.V. v. Sup. Ct*., 3 Cal. 4th 459, 465 (1992). The public policy exception applies here.

"California courts have recognized that there are no 'bright line rules for determining what is and what is not contrary to a fundamental policy of California.'" *Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co.*, 88 F.Supp.3d 1156, 1168 (S.D. Cal.

---

*Strategycorps,* No. 1:19-CV-3742-TWT, 2020 U.S. Dist. LEXIS 256375, at *12 (N.D. Ga. Mar. 23, 2020) ("contract interpretation is typically inappropriate at the motion to dismiss stage.").

2015) (citation omitted). To be "fundamental," the "policy must be a substantial one." *Id.* (citing *Brack v. Omni Loan Co.*, 164 Cal. App. 4th 1312, 1323 (2008)). For example, such policies "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." Comment (g) to Restatement (Second) of Conflict of Laws § 187.

Here, the prohibitions set forth in the Penal Code are undoubtedly fundamental policies of the state. *See* Cal. Penal Code § 630 (in enacting CIPA, the California legislature specifically stated that its intent was to "protect the right of privacy of the people of this state" and that the statute was designed to combat "a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."). Not only does CIPA protect the privacy of California residents by making certain acts illegal, CIPA punishes violators with criminal sanctions. Indeed, in the related context of Restatement Section 188, courts have held that CIPA represents an overriding public policy. *See, e.g.*, *Ades v. Omni Hotels Mgmt. Corp*., 46 F.Supp.3d 999, 1008-11 (C.D. Cal. 2014); *Erceg v. LendingClub Corp*., 475 F.Supp.3d 1071, 1078 (N.D. Cal. 2020) ("California has a greater interest in applying its privacy laws [i.e. CIPA] to protect the citizens of its states than Massachusetts does in applying its privacy laws to protect the citizens of a different state."). Likewise, the California Supreme Court posited that the failure to apply CIPA to California residents "would impair California's interest in protecting the degree of privacy afforded to California residents." *Kearney v. Salomon Smith Barney, Inc*., 39 Cal.4th 95, 100 (2006); *id*. at 125-26 ("California must be viewed as having a strong and continuing interest in the full and vigorous application of the provisions of [CIPA]"). Accordingly, Delta may not use a choice-of-law clause to avoid application of the California Penal Code to conduct affecting California consumers.

Delta argues that the exception to enforcement of a choice of law provision on public policy grounds (i.e., where the chosen law is contrary to a fundamental California policy) does not apply because "Georgia also provides a cause of action for wiretapping." Mot. at 17 (citing Ga. Code § 16-11-62). This argument rings hollow. The Georgia

statute, unlike CIPA, requires only the consent of *one party* to the communication—effectively waiving Plaintiffs' CIPA claims. *See* Ga. Code Ann. § 16-11-66 ("Nothing in Code Section 16-11-62 shall prohibit a person from intercepting a wire, oral, or electronic communication where such person is a party to the communication or one of the parties to the communication has given prior consent"). Notably, in *Kearney*, the California Supreme Court compared CIPA with the Georgia analog and found Georgia's protections insufficient. *Kearney*, 39 Cal.4th at 99, 122 (there is a "true conflict between California and Georgia law" and the "failure to apply California law . . . would impair California's interest in protecting the degree of privacy afforded to California residents.").

As courts have held, such a waiver of California law is unenforceable. *E.g.*, *Cody v. SoulCycle Inc.*, No. CV156457GHKJEMX, 2016 WL 4771392, at *9 (C.D. Cal. Jan. 11, 2016) (applying California law notwithstanding New York choice of law provision because "New York law allows these gift certificate expiration dates that California expressly prohibits" and thus "New York's law is contrary to a fundamental policy of California"); *Waryck v. Thor Motor Coach, Inc.*, No. 22-CV-1096-L-MDD, 2023 WL 3794002, at *4 (S.D. Cal. Jan. 13, 2023) (declining to enforce Indiana forum and choice of law provisions which "would cause Plaintiffs to lose any protections under California's Song-Beverly Act that do not exist under Indiana law, which is contrary to public policy."); *Bayol v. Zipcar, Inc.*, No. 14-CV-02483-TEH, 2014 WL 4793935, at *3-5 (N.D. Cal. Sept. 25, 2014) (holding Massachusetts choice of law clause unenforceable waiver of California consumer fraud protections).[4]

Thus, application of the Georgia privacy statute is against California public policy and cannot invalidate Plaintiffs' CIPA claims.

---

[4] Delta's citations to *Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. Jan. 9, 2017) and *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) does not alter this conclusion. Mot. at 18. Neither case sanctioned the application of foreign law to a California consumer where the foreign law effectively waived any entitlement to relief and the California law codified a fundamental public policy.

**2. Plaintiffs Did Not Consent to The Challenged Data Practices.**

Consent is an affirmative defense to the claims against Delta. "As the party seeking the benefit of an exception," Delta has "the burden to establish the existence of consent." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020); *accord Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021).

"[C]onsent is only effective if the person alleging harm consented to the particular conduct, or to substantially the same conduct, and if the alleged tortfeasor did not exceed the scope of that consent." *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1072-73 (N.D. Cal. 2016). If there is a genuine dispute over the scope of a privacy policy or whether it adequately discloses the conduct at issue, that is a question of fact which cannot be resolved on the pleadings. *See id.* (holding that "a reasonable jury could find that Yelp's Privacy Policy provisions do not explicitly address—and thus do not obtain knowing consent for—the uploading of a user's address book data for the purpose of finding friends who are already registered Yelp users"); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("At the motion to dismiss stage, the Court is not prepared to rule that the Privacy Policy establishes an absolute bar to Plaintiff's claims."); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847-48 (N.D. Cal. 2014) (explaining that, for a finding of consent, the disclosures must have given users notice of the "specific practice" at issue). This "actual consent" requirement, in other words, places the burden on Delta to demonstrate that its disclosures are susceptible to only one "plausible interpretation" for a finding of consent. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019); *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *10 (N.D. Cal. Dec. 22, 2022).

***Privacy Policy.*** There are several reasons a jury could find that Delta's Privacy Policy does not disclose the full scope of wiretapping.

<u>First</u>, Delta's reliance on Section 6.1 is misplaced. That section states "Delta has engaged third party tracking and advertising providers to act on Delta's behalf to track and analyze your use of our Website through the use of cookies pixel tags/web beacons,

and similar technologies." Mot. at 14, 19; Dkt. 12-2 at 6.1. The next sentence reads: "these third parties collect, and share with us, *usage information* about visits to our Website . . . track *page usage* and *paths followed* during visits through our Website, help us target our Internet banner advertisements on our Website and on other sites, and track use of our Internet banner advertisements and other links from our marketing partners' sites to our Website." Dkt. 12-2 at 6.1.

Reasonable consumers viewing these disclosures would not understand that Delta is sharing customer-specific information with third parties in an individually identifiable manner. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020) ("The Privacy Policy . . . does not indicate that such 'processing' might involve human reviewers listening to the audio"). Nowhere does Section 6.1 explain that Delta shares its customers' "departure date, departure airport, arrival date, arrival airport, travel class, number of travelers, loyalty status, language, and currency used" alongside their Facebook ID[5]—which allows the third party (here, Facebook) to identify the customer by name and build a profile on the customer's travel preferences. Compl. ¶¶ 2, 60-69.

Second, Delta argues that Section 6.2's reference to "cookies" and "pixel tags" "used by . . . Facebook . . . to target and re-target visitors to our Website . . . with digital advertising" is sufficient. Mot. at 14, 19; Dkt. 12-2 at 6.2. Not so. There is a critical difference between (1) retargeting customers using anonymous account identifiers, and (2) retargeting customers by disclosing their identity and detailed travel history to third parties. That is the crux of this case. Personalized travel history alongside "information that reveals a particular user's identity" is transmitted to Facebook. Compl. ¶¶ 60-69.[6]

---

[5] "A Facebook ID is a unique identifier that allows anyone to discover the user's identity." *Belozerov v. Gannett Co.*, No. CV 22-10838-NMG, 2022 WL 17832185, at *4 (D. Mass. Dec. 20, 2022).

[6] Section 4.1 is similarly inadequate. Mot. at 14. That section is entitled "How Delta Uses your Data" and states Delta (not third parties) may use "information related to a flight booking" to "send you marketing communications."

To be sure, “this provision is too general to conclusively establish consent.” *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 823. The Privacy Policy says nothing about the specific information that Delta will share with Facebook in a personally identifiable manner for retargeting. *Id.*; *see also Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847-48 (N.D. Cal. 2014) (disclosure “that Facebook ‘may use the information we received about you’ for ‘data analysis’” is “not specific enough to establish that users expressly consented to the scanning of the content of their messages . . . for alleged use in targeted advertising.”); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019) (“Although Facebook points to a section in its Data Use Policy entitled ‘Service Providers’ which says ‘we give your information to the people and companies that help us provide, understand, and improve the services we offer,’ that statement does not come close to disclosing the massive information-sharing program with business partners that the plaintiffs allege in the complaint.”).

Third, Section 7 of the Privacy Policy, entitled “With Whom Does Delta Share Your Information,” is inconsistent with the data sharing practices alleged in the Complaint. Section 7.1 begins by stating “We do not sell your name or other personal information to third parties.” It then lists the persons with whom Delta “may disclose your information,” and social media companies are not included. Immediately thereafter, Delta states “We may share with third parties *anonymous, aggregated information* about all our users.” (Emphasis added.) And “When you use the App, a unique ID (which varies by device manufacturer and operating system) is read from or associated with your device to be used as an *anonymous identifier* for analytics and performance purposes.” (Emphasis added.)

The net impression is that any information shared with third parties will be anonymous. Delta’s disagreement with Plaintiffs’ interpretation does not make that interpretation unreasonable as a matter of law. By analogy, in *Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023), Google “argue[d] summary judgment [was] appropriate because it disclosed” in its Privacy Policy “that it collects users’ data in

general, even if it did not disclose that it collects users' private browsing data in particular." *Id.* at 927-28. In response, the plaintiffs pointed to Google's various representations about incognito mode "affording more privacy than regular browsing mode," which they argued would affect how a reasonable user would understand Google's privacy practices. *Id.* The court rejected Google's argument that the Privacy Policy "unambiguously discloses" the at-issue practice, finding that, based on Google's other representations and omissions, "a material dispute of fact remain[ed] regarding the scope of users' consent." *Id. See also In re Meta Pixel Healthcare Litig*, 2022 WL 17869218, at *10 (finding consent could not be established where disclosures were susceptible of "multiple plausible interpretations").

The same reasoning applies here. Delta's representations in Section 7.1 are in conflict with Section 6.1 and 6.2. It is eminently reasonable for a consumer to believe that Delta meant what it said in Section 7.1—and at minimum, the conflict between these sections presents a question of fact.[7]

***Banner Pop-up.*** Delta argues that Plaintiffs were presented with a pop-up banner upon visiting Delta.com, which links to the Privacy Policy. Mot. at 20. However, that alleged pop-up is not referenced in the Complaint and cannot be considered on a motion to dismiss. *Mitchell v. NY & Co Ecomm LLC*, No. CV2310117MWFMRWX, 2024 WL 1328333, at *3 (C.D. Cal. Mar. 26, 2024) ("Just because Plaintiffs challenge the marketing and sales tactics used on Defendants' website does not mean the FAC

---

[7] *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190 (N.D. Cal. 2014), is distinguishable. That case involved the alleged collection of email addresses from users' contact lists. Unlike here, LinkedIn explicitly asked users to import their "Google Contacts" (including email addresses) and did not make contrary statements. *Id.* at 1211-12. *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018), is also distinguishable because the privacy policy disclosures were not internally contradicted by other representations. Here, the contradictions render the Privacy Policy "reasonably susceptible to more than one interpretation" with one interpretation belying consent. *McCoy*, 2021 WL 405816, at *6.

incorporates or necessarily relies on every representation made or document included on the website."); *Mosher-Clark v. Gravity Defyer Med. Tech. Corp.*, No. 22-CV-05288-HSG, 2023 WL 5836976, at *3 n.2 (N.D. Cal. Sept. 8, 2023) ("Defendant entirely fails to even try to explain why other parts of the website purportedly describing use instructions are properly considered under the incorporation by reference standard when the FAC does not cite them.").

***Facebook Registration***. Delta's reference to Facebook's alleged Terms of Service is also improper on a Rule 12 motion. Facebook's Terms is not cited in the Complaint (and is not attached to the Motion). Instead, Delta brings in the Facebook Terms to sustain a defense. And "if the document merely creates a defense to the well-pled allegations in the complaint, then the document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Khoja v. Orexigan Therapeutics, Inc*., 899 F.3d 988, 998-1002 (9th Cir. 2018).

### 3. Plaintiffs Plausibly Allege The Interception of Contents of a Communication.

Delta's attack on the remaining CIPA elements fail too. Mot. at 21-22.

***Interception.*** Delta's first argument—that no interception "in transit" occurred under CIPA—is simply wrong. Not even Facebook disputes that the Pixel operates as an interception. *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11-14 (N.D. Cal. Dec. 22, 2022) ("Meta does not dispute that the intentional or interception elements are met"); *see also Doe v. Eating Recovery Ctr. LLC*, No. 23-CV-05561-VC, 2024 WL 2852210, at *1 (N.D. Cal. June 4, 2024) (plausibly alleging interception given "multiple allegations that Meta's 'transmission of information through the Pixel is instantaneous' and that Meta's code redirects users' communications "simultaneously'"); *c.f. Tanner v. Acushnet Co.*, No. 8:23-CV-00346-HDV-ADSX, 2023 WL 8152104, at *6 (C.D. Cal. Nov. 20, 2023) (in a session replay case, holding that "Plaintiff alleges sufficient facts to

show the interception is made while in transit.") (Vera, J.).[8]

In short, the interception requirement is not a literal one. Rather, it occurs "when the contents of a wire communication are captured or re-directed in any way." *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (examining analogous federal Wiretap Act); *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11 ("the Ninth Circuit has construed the term [intercept] according to its ordinary meaning as the "act of acquiring, or coming into possession of"). The interception of an electronic communication includes the simultaneous transmission of duplicate communications. *Revitch v. New Moosejaw, LLC,* No. 18-CV-06827-VC, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("the particulars of the eavesdropping mechanism are of little consequence to the section 631 analysis," because "[s]ection 631's protections extend explicitly to the beginnings and ends of communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule.").

Here, as described in the Complaint, when a visitor wishes to access Delta's website, they enter the web address into their browser which then sends a GET Request to Delta's server. Compl. ¶¶ 48-59. The server responds by sending a GET Response which contains the webpage and the embedded Facebook Pixel code. *Id.* If no Pixel had been returned with the original GET Response, each time the visitor interacted with the website, a GET Request would be sent from the browser only to Delta's server. However, because the Pixel is embedded on Delta's webpage, it commands the browser to send two GET Requests in tandem—one to the intended recipient, Delta's server, and another,

---

[8] Delta argues that a California court rejected "identical allegations in a Facebook pixel case" filed by Plaintiffs' counsel. Mot. at 21 (citing *Barbour v. John Muir Health*, 2023 WL 2618967, at *5 (Cal. Super. Jan. 05, 2023). Delta overlooks that the *John Muir Health* court reversed course after an amended complaint was filed containing similar allegations. Wolf Decl., Ex. C (May 18, 2023 order overruling demurrer to CIPA claim).

unbeknownst to the visitor, to Facebook. *Id.* This is an "interception" under CIPA.

***Contents of Communication.*** Under CIPA, the term "'contents' refers to the intended message conveyed by the communication and does not include record information regarding the characteristics of the message that is generated during the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).[9] Record information and content, however, "are not mutually exclusive categories." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 139 (3d Cir. 2015). Information that would otherwise be considered "record information"—such as "names, addresses, telephone numbers, and email addresses"—are "contents" of a communication "where the user communicates with a website by *entering his information into a form* provided by the website." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021) (emphasis added). "For instance, contact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11.

Here, Plaintiffs allege they selected and entered their "departure date, departure airport, arrival date, arrival airport, travel class, [and] number of travelers," among other things, into Delta's "online forms." Compl. ¶¶ 17, 23, 29-30. These are not mere mouse clicks that convey no substance. Rather, they are the intended message conveyed to Delta for purposes of booking travel.

**4. The Discovery Rule Tolls Plaintiff Mansoori's CIPA Claim.**

Plaintiff Mansoori's CIPA claim is tolled by the discovery rule. *See Fox v. Ethicon Endo-Surgery, Inc*., 35 Cal.4th 797, 808 (2005) (to rely on rule, plaintiffs "must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence"); *Franklin v. Ocwen Loan*

---

[9] "The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *14 (N.D. Cal. Dec. 22, 2022).

*Servicing, LLC*, 2018 WL 5923450 (N.D. Cal. Nov. 13, 2018) ("[d]rawing all inferences in favor of the [P]laintiff, and [given] that resolution of this question is typically one of fact … [P]laintiff has alleged sufficient facts to avail himself of California's delayed discovery rule"). Plaintiff alleges that she, like all consumers, "had no reason to believe [her] personal information was being shared with Facebook or intercepted through Defendant's website in the manner described"—i.e., in a disaggregated and identifiable manner. Compl. ¶¶ 97-100. Delta's "Privacy Policy does not disclose this practice, and in fact leads reasonable users to believe otherwise." *Id.* "Furthermore, the technologies Defendant embedded on its website are not visible to the reasonable user—they are invisible and work in the background." *Id.* While Delta contends these allegations are "demonstrably implausible" given the Privacy Policy disclosures, Mot. at 23, Plaintiffs have properly pleaded tolling at the pleading stage.

### E. <u>Plaintiffs Have Standing For Injunctive Relief.</u>

Plaintiffs are not precluded from seeking injunctive relief simply because they challenge and are now aware of Delta's data sharing practices. This does not negate standing in the Ninth Circuit. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018) ("Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future."). As alleged in the Complaint, the practices at issue involve unseen source code, ongoing data sharing, and inadequate Privacy Policy disclosures. *E.g.*, Compl. ¶¶ 9, 35-47, 55, 66-69. Plaintiffs thus have standing. *D'Angelo v. FCA US, LLC*, No. 323CV00982WQHMMP, 2024 WL 1625771, at *7 (S.D. Cal. Mar. 28, 2024) (standing based on alleged "ongoing use of their intercepted data by Defendant and Salesforce").

## V. CONCLUSION.

Plaintiffs respectfully submit that Delta's Motion should be denied. However, if the Court deems any of the claims inadequately pleaded, Plaintiffs request leave to amend. There has been no prior judicial evaluation of the pleadings and Delta cannot demonstrate bad faith, dilatory motive, or prejudice.

Dated: August 14, 2024

Respectfully submitted,

By: */s/ Alexander E. Wolf*

ALEXANDER E. WOLF (SBN 299775)
awolf@milberg.com
JOHN J. NELSON (SBN 317598)
jnelson@milberg.com
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
280 South Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel: 872.365.7060

ALEC H. SCHULTZ (*pro hac vice* forthcoming)
HILGERS GRABEN PLLC
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone: 305.630.8304
aschultz@hilgersgraben.com